# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

NICHOLAS ALEXANDER DAVIS,    )
                            )
       Petitioner,               )
                            )
vs.                          )       NO. CIV-12-1111-HE
                            )
TERRY ROYAL, Warden,       )
     Oklahoma State Penitentiary,  )
                            )
       Respondent.[1]       )
                            )

## MEMORANDUM OPINION

Petitioner, Nicholas Alexander Davis, a state court prisoner, has filed a petition for a writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 17. Petitioner challenges the convictions entered against him in Oklahoma County District Court Case No. CF-2004-347. Tried by a jury in 2007, petitioner was found guilty of murder in the first degree, two counts of shooting with intent to kill, and possession of a firearm after former conviction of a felony. Petitioner was sentenced to death for the murder. In support of his death sentence, the jury found three aggravating circumstances: (1) petitioner knowingly created a great risk of death to more than one person; (2) the murder was committed while petitioner was serving a sentence of imprisonment on conviction of a

---

[1] *Pursuant to Fed. R. Civ. P. 25(d), Terry Royal, who currently serves as warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party respondent.*

felony; and (3) the existence of a probability that petitioner would commit criminal acts of violence that would constitute a continuing threat to society. For his non-capital crimes, petitioner received concurrent prison sentences of 45 years, 67 years, and 25 years, respectively (O.R. VII, 1331-34, 1339, 1383-84; O.R. VIII, 1468-71; Tr. 5/4/07, 912-13; Tr. 5/16/07, 1263-65; Tr. 8/31/07, 7, 9).

Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed in a published opinion. Davis v. State, 268 P.3d 86 (Okla. Crim. App. 2011), cert. denied, 568 U.S. 867 (2012). Petitioner also filed an application for post-conviction relief, which the OCCA denied in an unpublished opinion. Davis v. State, No. PCD-2007-1201 (Okla. Crim. App. Jan. 25, 2012).

Petitioner has presented eight grounds for relief. Respondent has responded to the petition and petitioner has replied. Docs. 26 and 35. In addition to his petition, petitioner has filed a motion for an evidentiary hearing. Doc. 19. After a thorough review of the entire state court record (which respondent has provided), the pleadings filed in this case, and the applicable law, the court concludes that, for the reasons set forth here, petitioner is not entitled to habeas relief.

## I. Facts.

In adjudicating petitioner's direct appeal, the OCCA set forth a summary of the facts. Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." Although this presumption may be rebutted,

the court finds that petitioner has not done so. Thus, as determined by the OCCA, the facts are as follows:

On January 15, 2004, at approximately 10:30 p.m., Tia Green picked up her sister, Chinetta Hooks, from work and took her home. Hooks, her husband and four children, all under the age of ten, lived in Apartment 1111 in the Falls Creek Apartments in Oklahoma City. Seventeen year old, Marcus Smith, Hooks' brother-in-law, had been watching the children while Hooks and her husband worked. When Green and Hooks arrived at the apartment, the children had made a pallet in the living room intending to sleep there all night. Hooks rejected the idea and sent the children to bed. She, Green and Smith then visited for a while.

Shortly after 11:00 p.m., there was a knock on the front door. Smith went to the front door and tried to look out of the peephole. However, the person on the other side had put their thumb over it. The trio inside the apartment repeatedly asked who was at the door but received no response. Thinking it might be his brother, Smith slightly opened the door. [Petitioner], clad completely in black clothing, forced his way into the apartment with a gun in his hand. He shut the front door behind him and locked it. [Petitioner] was Green's former boyfriend. She had only recently ended a turbulent relationship with him. When [Petitioner] entered the apartment, he pointed the gun at Smith as Smith put his hands in the air and backed up. Green and Hooks remained seated on the sofa. Smith asked [Petitioner], "what's going on" and "why are you doing this, man?" [Petitioner] offered no reply. Green also asked [Petitioner] what he was doing. [Petitioner] initially gave no response, but eventually looked at Green and said, "you hurt me for the last time." [Petitioner] then lowered the gun to his side. Green reached for her cell phone but [Petitioner] told her, "you bet not touch that phone." Green and Hooks then started screaming for [Petitioner] not to shoot. [Petitioner] responded by raising his gun, pointing it at Smith, then lowering the gun. Green pleaded with [Petitioner] to go outside with her and talk things over. [Petitioner's] response was to raise the gun a third time to Smith's head and fire.

After the first shot, Green ran into the nearby bathroom. She locked the door and attempted to call the police. Unable to get her call to go through, she phoned another sister, told her [Petitioner] had shot her, and directed her to call the police. [Petitioner] followed Green to the bathroom, kicking at the door and shouting at her to open the door.

Meanwhile, intending to call the police, Hooks had run into the kitchen upon hearing the first gunshot. She felt a shot go through her leg before falling to the floor. She heard a total of nine gunshots. The children, upon hearing the gunshots, ran to the kitchen to find their mother on the floor in a pool of blood. When they began screaming that their mother was going to die, Hooks told them to go to the neighbor's apartment. Still holding the telephone, she dialed 911, said she had been shot and then lost consciousness.

Green was still hiding in the bathroom when she heard the children run down the hallway toward the kitchen. As [Petitioner] was no longer kicking the door, Green left the bathroom and sat with her sister until police arrived. Oklahoma City Police Officer Matthew Reed responded to the 911 call and was met at the apartment complex gate by Hooks' children. Before being taken to the hospital, Green identified [Petitioner] as the shooter. She had been shot twice–once in the side and once in the back. The bullet which entered her side became lodged in her chest while the other bullet exited her body.

Hooks had been shot in the right arm, right leg, and the back of her head. Only the bullet to her arm became lodged in her body, the other two having exited. Marcus Smith was dead at the scene. He had been shot three times–on the top of his head, the left shoulder, and the back between the shoulder blades. The bullet to his left shoulder was the only one to exit his body.

After the shootings, [Petitioner] fled the scene. He was eventually arrested four months later in San Antonio, Texas. [Petitioner] voluntarily spoke with police and told them he threw the murder weapon onto the side of an interstate highway in Oklahoma. The weapon has never been recovered. [Petitioner] also told police that Green had called him and told him to meet her at her sister's apartment so they could talk. He said he took a gun with him because he did not trust Green as she had tried to harm him in the past. [Petitioner] said he was surprised to find Smith at the apartment as he was not expecting a man to be there. [Petitioner] admitted shooting Green, Hooks and Smith but said he shot Smith in self-defense after Smith lunged at him.

Davis, 268 P.3d at 97-99.

## II.  Standard of Review.

### A.      Exhaustion as a Preliminary Consideration.

The exhaustion doctrine, a matter of comity which has long been a part of habeas corpus jurisprudence, requires the court to consider in the first instance whether petitioner has presented his grounds for relief to the OCCA.  As the Supreme Court stated in Coleman v. Thompson, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights."  The exhaustion doctrine is set forth in 28 U.S.C. § 2254(b). Section 2254(b)(1)(A) prohibits the court from *granting* habeas relief in the absence of exhaustion (although Section 2254(b)(1)(B) sets forth two limited exceptions to this rule), but Section 2254(b)(2) expressly authorizes the court to *deny* habeas relief "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

### B.      Procedural Bar.

Beyond the issue of exhaustion, the court must also examine how the OCCA adjudicated each of petitioner's grounds for relief, i.e., whether the OCCA addressed the merits of petitioner's grounds or declined to consider them based on a state procedural rule. "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729).  "The doctrine applies to bar federal habeas [relief] when a state court declined to address a prisoner's federal claims

because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

## C. Limited Merits Review.

When the OCCA has addressed the merits of one of petitioner's grounds for relief, the court reviews that ground in accordance with the standard of relief set forth in 28 U.S.C. § 2254(d). Pursuant to that section of the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order for petitioner to obtain relief, he must show that the OCCA's adjudication of his claim either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (acknowledging that "[t]he petitioner carries the burden of proof"). The very focus of this statutory provision is the reasonableness of the OCCA's decision. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). In other words, "[i]t is not enough that [this] court, in its independent review of the legal question, is left with a firm conviction that the [OCCA] was erroneous." What is required is a showing that the OCCA's decision is "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citation omitted).

The Supreme Court has repeatedly acknowledged that Section 2254(d) "'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court[,]'" and that "[i]f [it] is difficult to meet, that is because it was meant to be." White v. Wheeler, 577 U.S. ___, 136 S. Ct. 456, 460 (2015) (quoting Burt v. Titlow, 571 U.S. ___, 134 S. Ct. 10, 16 (2013)); Harrington v. Richter, 562 U.S. 86, 102 (2011). Section 2254(d) "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Richter, 562 U.S. at 102. What remains, then, is a very narrow avenue for relief, one that permits relief only "*where there is no possibility* fairminded jurists could disagree that the [OCCA's] decision conflicts with [the Supreme] Court's precedents." Id. (emphasis added).

> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 102-03 (citation omitted). When reviewing a claim under Section 2254(d), review "is limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 563 U.S. at 181.

### III. Analysis.

**A.    Grounds One and Two:    Ineffective Assistance of Trial and Appellate Counsel for Failing to Present Mental Health Evidence.**

In Ground One, petitioner asserts that his trial counsel was ineffective for failing to investigate, develop, and present evidence that he suffers from Posttraumatic Stress

Disorder, Traumatic Brain Injury, and Major Depressive Disorder.[2] In Ground Two, petitioner faults his appellate counsel for not raising his Ground One on direct appeal. For the following reasons, petitioner is not entitled to relief on either ground.

Petitioner asserts that his Grounds One and Two were presented to the OCCA in his post-conviction application. Pet. at 28, 36-37. On post-conviction, petitioner asserted that both trial and appellate counsel were ineffective for "FAILING TO ADEQUATELY INVESTIGATE, DEVELOP AND PRESENT PSYCHOLOGICAL EVIDENCE . . . [.]" Application for Post-Conviction Relief (hereinafter "APCR") at 8. Because the jury did not hear evidence of his "severe mental illness," petitioner argued that both stages of his trial were affected. Id. at 9. Relying on an affidavit from Dr. Lara Duke, a licensed psychologist who evaluated him in November 2009, petitioner stated that his mental illness was Posttraumatic Stress Disorder (hereinafter "PTSD"). Id. at 10 & n.2 (referencing APCR Exhibit 3 and faulting his trial and appellate counsel for not presenting his PTSD diagnosis at trial or on appeal). Petitioner argued that had trial and appellate counsel developed this evidence, they could have shown that his PTSD "affected his intent at the time of the crime." Id. at 10. Petitioner further argued that "[e]vidence of [his] PTSD would have been relevant to the issue of whether he shot with malice aforethought, or did so out of a sense of exaggerated fear and terror caused by his PTSD." Id. at 12. With

---

[2] *Although petitioner makes references to other mental health issues he may have, the references are both vague and unsupported. Pet. at 6, 20, 23, 29. In addition, like the other unexhausted claims raised in his Grounds One and Two, any claim of ineffective assistance of counsel related to other mental impairments would be procedurally barred.*

respect to sentencing, petitioner acknowledged that appellate counsel had not only challenged trial counsel's mitigation case on direct appeal (on different grounds)[3] but had asked for and received an evidentiary hearing to establish trial counsel's ineffectiveness. However, petitioner faulted his appellate counsel for "wholly fail[ing] to develop or present *expert* testimony relating to [his] serious psychological condition." Id. at 15. Petitioner claimed that had "counsel presented evidence of [his] mental illness, there is a reasonable probability that the result of the sentencing proceeding would have been different." Id. at 16.

In addressing petitioner's ineffectiveness claims, the OCCA acknowledged that petitioner's specific complaint was the failure of trial and appellate counsel to discover and utilize his PTSD diagnosis. Davis, No. PCD-2007-1201, slip op. at 3. Because the trial counsel aspect of this claim could have been presented on direct appeal, the OCCA found it waived. Id. at 4, 6-7. Regarding the appellate counsel challenge, the OCCA denied relief on the merits. Id. at 7-8.

### Unexhausted Claims

Respondent argues that portions of petitioner's Grounds One and Two are unexhausted. He is correct. As set forth above, petitioner's post-conviction challenge was limited to counsels' alleged failures with respect to his PTSD diagnosis. He did not make any assertion about counsels' alleged failures with respect to his diagnoses for Traumatic

---

[3] *On direct appeal, petitioner faulted trial counsel for not presenting (1) an expert to explain how his past experiences affected his behavior and (2) his brother to testify about their childhood experience.* Davis, *268 P.3d at 129-38.*

Brain Injury and Major Depressive Disorder.[4]  In order to exhaust these portions of his Grounds One and Two (hereinafter "TBI/MDD ineffectiveness claims"), petitioner would have to return to state court and file a second post-conviction application.  Contending that the OCCA would refuse to hear the merits of petitioner's TBI/MDD ineffectiveness claims due to petitioner's failure to raise them in his first post-conviction application, respondent asserts that these claims should be procedurally barred.  See Anderson v. Sirmons, 476 F.3d 1131, 1139-40 n.7 (10th Cir. 2007) ("Anticipatory procedural bar occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it.") (internal quotation marks and citation omitted); Okla. Stat. tit. 22, § 1089(D)(8).[5]

---

[4] *According to information supplied by petitioner, petitioner was diagnosed with these conditions in 2013, over a year after his post-conviction application was denied. See Pet'r's Attachs. 9 and 18.*

[5] *"If an original application for post-conviction relief is untimely or if a subsequent application for post-conviction relief is filed after filing an original application, the Court of Criminal Appeals may not consider the merits of or grant relief based on the subsequent or untimely original application unless:*

    *a.  the application contains claims and issues that have not been and could not have been presented previously in a timely original application or in a previously considered application filed under this section, because the legal basis for the claim was unavailable, or*

    *b.  (1) the application contains sufficient specific facts establishing that the current claims and issues have not and could not have been presented previously in a timely original application or in a previously considered application filed under this section, because the factual basis for the claim was unavailable as it was not ascertainable through the exercise of reasonable diligence on or before that date, and*

    *c.  (2) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for*

Petitioner makes several arguments as to why a procedural bar should not be applied. First, petitioner attempts to satisfy an exception to its application. In Coleman, 501 U.S. at 750, the Supreme Court held that a habeas petitioner can obtain merits review of a claim he defaulted in state court by "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law . . . ." Specific to his Ground One, and with reference to his Ground Two, petitioner faults his appellate counsel for failing to raise the TBI/MDD ineffectiveness claims on direct appeal. However, appellate counsel's failure to raise these claims on direct appeal does not excuse petitioner's failure to raise them in his first post-conviction application.

Petitioner also makes general challenges to the independence and adequacy of the OCCA's procedural rules. "To be independent, the procedural ground must be based solely on state law." Thacker v. Workman, 678 F.3d 820, 835 (10th Cir. 2012). "To be adequate, the procedural ground must be strictly or regularly followed and applied evenhandedly to all similar claims." Id. at 835 (internal quotation marks and citation omitted).

Citing the OCCA's decision in Valdez v. State, 46 P.3d 703 (Okla. Crim. App. 2002), petitioner asserts that because Valdez gives the OCCA discretion to grant relief on post-conviction claims which would otherwise be precluded from merits review due to the OCCA's own procedural rules, the OCCA's rules are not adequate. Petitioner also claims that because the OCCA must necessarily review the underlying claim in order to evaluate

_____

the alleged error, no reasonable fact finder would have found the applicant guilty of the underlying offense or would have rendered the penalty of death."

whether <u>Valdez</u> relief is warranted, the OCCA's rules are not independent. Pet. at 82-85. This argument, however, has been repeatedly rejected by the Tenth Circuit. <u>Fairchild v. Trammell</u>, 784 F.3d 702, 719 (10th Cir. 2015); <u>Williams v. Trammell</u>, 782 F.3d 1184, 1213-14 (10th Cir. 2015); <u>Black v. Tramwell [sic]</u>, 485 F. App'x 335 (10th Cir. 2012); <u>Banks v. Workman</u>, 692 F.3d 1133, 1144-47 (10th Cir. 2012); <u>Black v. Workman</u>, 682 F.3d 880, 914, 916-19 (10th Cir. 2012); <u>Thacker</u>, 678 F.3d at 834-36; <u>Spears v. Mullin</u>, 343 F.3d 1215, 1254-55 (10th Cir. 2003).

Petitioner additionally asserts that the OCCA's Rule 3.11, which concerns supplementation of the record on direct appeal, is inadequate. By challenging Rule 3.11, petitioner necessarily implies that his first post-conviction application was his first genuine opportunity to raise his trial counsel ineffectiveness claims. Pet. at 82 & n.17. However, like his appellate counsel as cause argument, the adequacy or inadequacy of Rule 3.11 is irrelevant to the procedural rule at issue here. Even if Rule 3.11 was found inadequate, it would only excuse petitioner's failure to raise the TBI/MDD ineffectiveness claims on direct appeal. It would not excuse his failure to raise the claims in his first post-conviction application.

In sum, petitioner's TBI/MDD ineffectiveness claims are procedurally barred. Because petitioner has not presented these claims to the OCCA and because it is clear that the OCCA would refuse to hear the merits of the claims if petitioner attempted to exhaust them now, an anticipatory procedural bar applies. As petitioner has offered no sufficient reason to excuse its application, the court concludes that these claims as presented in both is his Grounds One and Two are procedurally barred.

## PTSD Claims

What remains then are petitioner's claims of ineffectiveness related to his PTSD. As noted above, the OCCA found the trial counsel aspect of this claim to be barred. Davis, No. PCD-2007-1201, slip op. at 7 ("While Dr. Duke did not meet with Petitioner until after the direct appeal had been filed, all of the information she relied upon in making her assessment was available to appellate counsel. As Petitioner's claim does not depend on facts unavailable at the time of his direct appeal, he has failed to meet the conditions for review of this claim on the merits and therefore review is barred."). As with petitioner's TBI/MDD ineffectiveness claims, respondent asserts that the trial counsel PTSD claim should be also procedurally barred. Therefore, the court must again address petitioner's arguments against its application, but with relation to petitioner's failure to raise the claim on direct appeal.

As for petitioner's independence/adequacy challenges, the Valdez discussion above applies equally here. Based on Tenth Circuit precedent, the court declines to excuse petitioner's default of his trial counsel PTSD claim based on Valdez. Petitioner's challenge based on Rule 3.11 also lacks merit. Although Rule 3.11 is relevant here and its alleged inadequacy could explain petitioner's failure to raise his trial counsel PTSD claim on direct appeal, petitioner's specific adequacy challenge was expressly rejected by the Tenth Circuit in Lott v. Trammell, 705 F.3d 1167, 1213 (10th Cir. 2013). Petitioner's challenge to Rule 3.11 is also undercut by the fact that he utilized Rule 3.11 in his own direct appeal to obtain an evidentiary hearing on other trial counsel ineffectiveness claims which were outside the appellate record. Under these circumstances, petitioner is hard pressed to argue

that Rule 3.11 is an inadequate procedure to develop extra-record ineffective assistance of counsel claims.

Petitioner's stated cause, appellate counsel ineffectiveness (which is also raised as a freestanding claim), applies to his trial counsel PTSD claim and requires greater discussion.[6] Because the OCCA addressed the merits of petitioner's appellate counsel claim, it is entitled to AEDPA deference. <u>See</u> <u>Richter</u>, 562 U.S. at 105 (discussing the double deferential standard when the limitations of the AEDPA are applied to a claim of ineffective assistance of counsel).[7]

"A claim of ineffective assistance of appellate counsel can serve as cause and prejudice to overcome a procedural bar, if it has merit." <u>Ryder ex rel. Ryder v. Warrior</u>, 810 F.3d 724, 747 (10th Cir. 2016), <u>cert.</u> <u>denied</u> 137 S. Ct. 498 (2016). Whether appellate counsel was ineffective is governed by the test set forth in <u>Strickland v Washington</u>, 466 U.S. 668 (1984). <u>Milton v. Miller</u>, 744 F.3d 660, 669 (10th Cir. 2014) (citing <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000)). <u>Strickland</u> requires a petitioner to show (1) that his appellate counsel's actions on appeal were objectively unreasonable and (2) that, but for counsel's unreasonable actions, there is a reasonable probability that he would have prevailed on appeal. <u>Robbins</u>, 528 U.S. at 285-86; <u>Miller v. Mullin</u>, 354 F.3d 1288, 1297 (10th Cir. 2004) (quoting <u>Ellis v. Hargett</u>, 302 F.3d 1182, 1186-87 (10th Cir. 2002)).

---

[6] *In rejecting petitioner's stated cause, the court likewise denies petitioner's Ground Two.*

[7] *Review is limited to the record that was before the OCCA. <u>Pinholster</u>, 563 U.S. at 181. Therefore, Petitioner's Attachments 5 through 17, relied upon by petitioner in support of his PTSD ineffectiveness claims, will not be considered.*

When an appellate counsel claim concerns omitted issues, Strickland's first prong requires a showing that counsel unreasonably omitted "nonfrivolous issues." Robbins, 528 U.S. at 285. When counsel has filed a brief on the merits, it is difficult to show his incompetence for failing to raise a particular claim. Id. at 288. Appellate counsel does not have an obligation to raise every possible claim irrespective of its merit. In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail . . . ." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)). "This has assumed a greater importance in an era when oral argument is strictly limited in most courts–often to as little as 15 minutes–and when page limits on briefs are widely imposed." Jones, 463 U.S. at 752-53.

The omitted claim in the present case is trial counsel ineffectiveness, which is also governed by Strickland. As with appellate counsel claims, Strickland requires a defendant to show that his trial counsel was deficient and that he was prejudiced by it. Strickland, 466 U.S. at 687. A defendant must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. The assessment of counsel's conduct is "highly deferential," and a defendant must overcome the strong presumption that counsel's actions constituted "'sound trial strategy.'" Id. at 689 (citation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." Id. at 690.

As Strickland cautions, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Therefore, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. Within "the wide range of reasonable professional assistance," "[t]here are countless ways to provide effective assistance in any given case[, and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id.

As for prejudice, Strickland requires a defendant to show that his trial counsel's errors and omissions resulted in actual prejudice to him. Id. at 687. In order to make a threshold showing of actual prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

In denying petitioner's appellate counsel claim, the OCCA concluded that petitioner had failed to show that his appellate counsel was deficient in not raising the PTSD claim on direct appeal. In fact, the OCCA found that petitioner "ha[d] not provided *any* support for his claim appellate counsel did not fully investigate the psychological evidence." Davis, No. PCD-2007-1201, slip op. at 7 (emphasis added). While petitioner's underlying claim was that trial counsel had erred in failing to present evidence of PTSD, the only

evidence he presented in support was the affidavit of Dr. Duke. He did not provide the OCCA with any statement or affidavit from trial counsel regarding why this evidence was not presented.[8] Id. Thus, the OCCA concluded that petitioner "ha[d] not rebutted the presumption that counsel acted as competent counsel and fully investigated the issue and purposefully omitted the claim from the direct appeal." Id. at 7-8.[9]

Denying petitioner relief because he failed to meet his burden of proof is reasonable. As discussed above, the Strickland standard is high and very deferential to counsel. However, the record provides additional support for the OCCA's determination that appellate counsel was not deficient. At the evidentiary hearing held on direct appeal, appellate counsel repeatedly stated that she had intentionally omitted a challenge to trial counsel's failure to present mental health evidence.[10] During an ex parte hearing, appellate

---

[8] *Interestingly, trial counsel did provide an affidavit on direct appeal. The affidavit was included with petitioner's Rule 3.11 motion. Davis, 268 P.3d at 131-32.*

[9] *With obvious reference to the evidentiary hearing conducted on direct appeal, during which both trial counsel and an investigator for the defense gave extensive testimony about their preparation of the mitigation case, the OCCA additionally concluded that "[t]he record reflects counsel fully investigated Petitioner's background and was well acquainted with the information upon which Dr. Duke relied." Davis, No. PCD-2007-1201, slip op. at 8.*

[10] *Tr. 12/3/09, 380-81 ("We purposely didn't raise Counsel's failure not to retain [a] mental health expert and not to present the mental health history . . . ."); 548 ("We haven't raised an issue with lack of psychological testing."); 550 ("We've never submitted that [trial counsel] should have had him tested or should have presented any kind of mental illness evidence."); 552 ("We've never argued that [trial counsel] was ineffective for failing to put Dr. Edgar on. . . . Or any other mental health expert."); 553 ("[W]e haven't claimed the ineffective assistance of counsel for failure to put on mental health experts."); 554 ("We are not alleging ineffective assistance of counsel for failing to put on a mental health expert to talk about his mental state."); 555 ("I'm saying we have not raised an issue with the fact that [trial counsel] did not call a psychologist to do testing and to testify about any mental health issues [petitioner] might have . . . .").*

counsel even informed the trial court of the reason why no such challenge was raised – petitioner *had* been evaluated and was diagnosed a psychopath. Appellate counsel provided the trial court with a copy of a memorandum prepared by trial counsel. The memorandum is dated January 2, 2007, some three months before trial. In the memo, trial counsel discusses Dr. Terese Hall's evaluation of petitioner:

> This morning Terese Hall and I spoke about [petitioner]. Terese called over the holiday and left a message that she had ceased work on [petitioner's] case because she does not believe she can be of assistance to us.
>
> Teresa [sic] said that after seeing [petitioner] for several hours at the county jail (a visit she characterized as "what an impression."), and after reviewing our reports of interviews with family members, Terese is of the opinion that nothing about [petitioner's] upbringing was "that bad," such that we should be seeing the kind of person that he is. Terese said she sees nothing to explain why [petitioner] is what he is – a psychopath.
>
> Terese said that she does not need to do testing to see clearly that [petitioner] is anti-social personality disordered. He scores high on any risk assessment scale, without her even needing to test him. He's high on the Hare Psychopathy Checklist.
>
> Terese said what literature there is out there on psychopaths tells us that they are born not made. She said nothing about his upbringing explains his psychopathy; his neuro deficits are born with him – the risk taking, the not caring for others, only caring for self. . . .
>
> Terese noted that [petitioner] is highly resistant to suggestion that his view of the case is indefensible and unrealistic. She also noted that he is agitated enough – filled with anger and self-justification-- that he will frighten a jury. She does not think he should testify, but doubts we will be able to keep him

from doing so, as he is convinced that once a jury hears what he has to say that they will acquit him.

(Tr. 12/3/09, 380-383; Court's Exhibit 3).[11]

This clearly explains why appellate counsel did not challenge trial counsel's decision regarding mental health evidence. Trial counsel, an experienced capital litigator,[12] had petitioner evaluated by Dr. Hall, a clinical psychologist. See Diestel v. Hines, 506 F.3d 1249, 1258 (10th Cir. 2007) (noting that Dr. Hall has a Ph.D. in clinical psychology and a law degree and has experience as a private practice psychologist and a state-employed forensic psychologist). After meeting with petitioner for several hours, Dr. Hall diagnosed petitioner as a psychopath.[13] Because psychopathy, or Antisocial Personality Disorder, is a damaging diagnosis,[14] it was not beneficial to his defense. As for guilt, it clearly would

---

[11] *Although this document was originally filed under seal, the OCCA unsealed it by order dated January 7, 2014. A copy of the order is attached to the response as Exhibit 1.*

[12] *At the time of petitioner's trial, trial counsel had been a regularly practicing capital trial attorney for eleven years. As of December 2009 (when trial counsel testified at the evidentiary hearing held on direct appeal), trial counsel had tried fifteen to twenty capital cases (Tr. 12/3/09, 476, 497, 500; Tr. 12/4/09, 596).*

[13] *While petitioner notes that Dr. Hall did not do any forensic testing in arriving at her diagnosis, Pet. at 15, 19, he does not question her credentials as a psychologist, assert that her diagnosis was invalid without testing, or deny that he is a psychopath.*

[14] *"The essential feature of Antisocial Personality Disorder is a persuasive pattern of disregard for, and violation of, the rights of others." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 701 (4th ed. text rev. 2000). Psychopaths are deceitful and manipulative, and they "fail to conform to social norms with respect to lawful behavior." Id. at 702. They are impulsive, irritable, aggressive, and "consistently and extremely irresponsible." They "may repeatedly get into physical fights or commit acts of physical assault," and "[t]hey may be indifferent to, or provide a superficial rationalization for, having hurt, mistreated, or stolen from someone." Id. They "frequently lack empathy and tend to be callous, cynical, and contemptuous of the feelings, rights, and sufferings of others." Id. at 703.*

have clouded any credence the jury was willing to lend to petitioner's version of the event, and during the sentencing stage, it would have equated to confirmation that he is a continuing threat to society.  See Jones v. Sec'y, Florida Dep't of Corr., 834 F.3d 1299, 1313 (11th Cir. 2016), cert. denied, 37 S. Ct. 2245 (2017) ("[W]e have often observed that evidence of a defendant's antisocial personality disorder can negatively impact the jury."); Reed v. Sec'y, Florida Dep't of Corr., 593 F.3d 1217, 1246 (11th Cir. 2010) (a "diagnosis of antisocial personality disorder [is] . . . not 'good' mitigation"); Stafford v. Saffle, 34 F.3d 1557, 1565 (10th Cir. 1994) (acknowledging that antisocial behavior plays into the jury's assessment of the continuing threat aggravating circumstance).  It therefore follows that appellate counsel did not raise the issue due to its lack of merit as Strickland holds that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."  Strickland, 466 U.S. at 690.

Nevertheless, petitioner contends that trial counsel should not have relied on Dr. Hall's evaluation but should have had petitioner evaluated by additional mental health experts until she discovered that he had PTSD.[15]  However, Strickland does not require endless investigation, but only reasonable investigation. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying

---

[15] *Petitioner does not fault trial counsel for failing to see the "[n]umerous markers for [PTSD]."  In fact, he acknowledges that trial counsel was aware of some of them and perhaps even all of them.  Pet. at 6, 19, 21.*

a heavy measure of deference to counsel's judgments." <u>Strickland</u>, 466 U.S. at 691. With obvious concern for petitioner's mental health, trial counsel had petitioner evaluated by a clinical psychologist. But when that evaluation revealed that petitioner's mental health would not be helpful to his defense, trial counsel reasonably and strategically pursued other lines of defense. This is not deficient performance. See <u>Rompilla v. Beard</u>, 545 U.S. 374, 383 (2005) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste.").

In addition to finding no deficient performance, the OCCA also found a lack of prejudice. See <u>Davis</u>, No. PCD-2007-1201, slip op. at 8. Although petitioner contends that the OCCA's prejudice analysis should be reviewed de novo, Reply at 2, the court concludes that even under de novo review, petitioner has not shown that he was prejudiced by appellate counsel's failure to raise the trial counsel PTSD claim on direct appeal. To establish appellate counsel prejudice, petitioner much show a reasonable probability he would have prevailed on appeal if the claim had been raised. <u>Robbins</u>, 528 U.S. at 285-86. However, petitioner would not have prevailed on appeal because the record refutes any claim that trial counsel was deficient. <u>Strickland</u>, 466 U.S. at 687 (to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate *both* deficient performance and prejudice). As discussed above, because trial counsel conducted a reasonable investigation into petitioner's mental health and then made a strategic decision not to present any mental health evidence, petitioner's trial counsel PTSD claim fails to meet <u>Strickland's</u> standard for relief. Therefore, petitioner was not prejudiced by appellate

counsel's failure to raise the claim.  See Freeman v. Atty. Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim . . . .").

For the foregoing reasons, the court concludes that petitioner's trial counsel PTSD claim is procedurally barred and that the related appellate counsel claim is denied on the merits.  Therefore, no relief is warranted on either of petitioner's first two grounds for relief.

### B.    Ground Three:    Marcus Smith's Criminal History.

In Ground Three, petitioner claims that the sentencing stage of his trial was fundamentally flawed because he was not allowed to present evidence of Marcus Smith's criminal history. Petitioner asserts that he should have been allowed to present this evidence because it was relevant, mitigating, and necessary to counter the victim impact testimony which he characterizes as "extremely flattering" of Mr. Smith. Pet. at 39. Because he was not allowed to present this evidence, petitioner claims that he was denied his right to confront witnesses, his right to a fair sentencing proceeding, and his right to due process.

Petitioner raised this claim[16] on direct appeal, and the OCCA denied relief on the merits.  In denying relief, the OCCA concluded that the State's victim impact evidence did not open the door to Mr. Smith's history of juvenile crime, that the evidence was neither relevant nor mitigating, and that there was "no possible federal constitutional violation

_____

[16] *On direct appeal, however, petitioner challenged the trial court's ruling with respect to both stages of trial. Davis, 268 P.3d at 125-28.  Here, petitioner alleges only second stage error.*

from the omission of the evidence." <u>Davis</u>, 268 P.3d at 126-28. Because the OCCA addressed this claim on the merits, it is reviewed in light of AEDPA deference. <u>See</u> <u>Frost v. Pryor</u>, 749 F.3d 1212, 1225 (10th Cir. 2014) ("Under the test, if all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied."); <u>Stouffer v. Trammell</u>, 738 F.3d 1205, 1221 (10th Cir. 2013) ("We may reverse only if all fairminded jurists would agree that the state court got it wrong.") (internal quotation marks and citation omitted).

In addition to testimony about how their family member's murder affected them, Mr. Smith's mother, father, and brother made the following statements, which petitioner contends opened the door to the evidence he sought to present:

- Marcus was in the process of enrolling at Job Corp, his interests was [sic] auto mechanic and rapper. He was ready to support his life and others (Tr. 5/14/07, 1010);

- Marcus was a Christian and a member in good standing at Abyssinia Missionary Baptist Church where he and I [Mr. Smith's father] served breakfast every Saturday, cut grass and cleaned up around the church (<u>Id.</u> at 1014);

- He would call me [Mr. Smith's brother] on a regular basis to ask me if I had any work he could do to make some extra money (<u>Id.</u> at 1038); and

- I've [Mr. Smith's brother] watched him grow in his faith in Jesus Christ, saw him teach my son and nephews life lessons that my older brother and I had taught him (<u>Id.</u>).

Petitioner asserts that this "good kid" evidence gave the jury an inaccurate picture of who Mr. Smith was. Pet. at 39. Therefore, to give the jury a more accurate picture, petitioner wanted to cross-examine Mr. Smith's family members and present several witnesses to show that Mr. Smith, who was only seventeen years old at the time of his death, had been involved in criminal activity since age eleven. Petitioner offered a Stage Two Chronology which showed, among other things, that Mr. Smith was a suspected gang member with prior arrests for vandalism, shoplifting, and burglary and a suspect in several crimes including burglary, destruction of property, animal cruelty, and assault and battery (Def's Ex. 39).[17] See also Court's Exs. 5-12 (police reports involving Mr. Smith).

Petitioner contends that the OCCA's decision is based on an unreasonable determination of the facts. He asserts that the OCCA denied him relief because it erroneously concluded that all references to Mr. Smith's character had been redacted from the victim impact statements. Pet. at 40. While the OCCA found that the trial court's statement to this effect was supported by the record,[18] Davis, 268 P.3d at 126-27, it also found that even if the victim impact testimony included evidence of Mr. Smith's character (like his father's reference to Mr. Smith being a Christian and a church member), it was not sufficient to open the door to Mr. Smith's criminal past. "[A] criminal trial is not to be based upon so-called 'character' evidence, and the same principle applies to sentencing

---

[17] *Although marked as a defendant's exhibit, Def.'s Ex. 39 was not admitted (Tr. 5/14/07, 1031).*

[18] *The record shows that a significant amount of time was spent redacting the victim impact statements to remove inappropriate comments and references to Mr. Smith's character to which petitioner objected (O.R. IV, 730-38, 747-51; Tr. 5/14/07, 924-45, 1000-07, 1023-24, 1029).*

proceedings." Id. at 127 (quoting Malone v. State, 58 P.3d 208, 210 (Okla. Crim. App. 2002)). The OCCA also denied petitioner's claim because the evidence was neither relevant nor mitigating. Id. Because the OCCA's decision did not turn on a factual finding of whether or not all of the references to Mr. Smith's character had been redacted, and because the OCCA also denied petitioner's claim on other grounds, petitioner has failed to show that the OCCA's decision is *based* on an unreasonable determination of the facts. See Smith v. Duckworth, 824 F.3d 1233, 1251 (10th Cir. 2016), cert. denied, 137 S. Ct. 1333 (2017), reh'g denied, 137 S. Ct. 2153 (2017) ("Under § 2254(d)(2), 'an unreasonable determination of the facts does not, itself, necessitate relief.' Rather, a habeas petitioner must demonstrate that the state court's decision is 'based on' – i.e., 'rests upon' – that unreasonable determination of the facts.") (quoting Byrd v. Workman, 645 F.3d 1159, 1172 (10th Cir. 2011)).

Petitioner has also not shown that the exclusion of this evidence denied him a fair sentencing proceeding. In Lockett v. Ohio, 438 U.S. 586, 604 (1978), the Supreme Court held that a capital offender has a constitutional right to present evidence of "[his] character or record and any of the circumstances of the offense that [he] proffers as a basis for a sentence less than death." However, the evidence which petitioner wanted to present does not fit either category. Petitioner wanted to present evidence of Mr. Smith's character, not his own, and it is clear that the evidence did not relate to the circumstances of the offense. As the OCCA found, "[Mr. Smith's] history of juvenile crime had nothing to do with his murder and inclusion of the evidence would not have added to the jury's picture of the crime." Davis, 268 P.3d at 127.

The trial court appropriately noted that in looking at the entire crime in this case, "it had nothing to do with self-defense issues . . . It has to do with a person that was a bystander. He just happened to be there at the wrong time."

To the extent [Mr. Smith's] juvenile crimes were relevant to [petitioner's] state of mind when he fired the gun; the jury had already found [petitioner] intentionally and with premeditation killed [Mr. Smith]. Any evidence concerning his state of mind was no longer relevant. See Rojem v. State, 2006 OK CR 7, ¶ 56, 130 P.3d 287, 298-99 (improper for issue of residual doubt to make its way into a capital sentencing proceeding).

Further, we fail to see how this evidence could in any way be considered mitigating. Evidence of [Mr. Smith's] criminal history which had no relation to the crime and of which [petitioner] was not aware does not reduce the degree of [petitioner's] moral culpability or blame, and are not circumstances which in fairness, sympathy or mercy may lead jurors to decide against imposing the death penalty. See OUJI–CR (2d) 4-78 (definition of mitigating circumstances).

Id.

As for petitioner's confrontation claim, respondent asserts that it has not been adequately presented here and that in any event, it should be denied because the Supreme Court has never held that the Confrontation Clause applies to sentencing proceedings. See Carter v. Bigelow, 787 F.3d 1269, 1294 (10th Cir. 2015) ("The Supreme Court has never held that the Confrontation Clause applies at capital sentencing."); Wilson v. Sirmons, 536 F.3d 1064, 1111-12 (10th Cir. 2008). Although both assertions are valid, the claim also fails on the merits.

While "[t]he right to cross-examine witnesses in a criminal trial is an essential part of the right to confront witnesses enshrined in the Confrontation Clause of the Sixth Amendment, . . . that right is not unlimited." United States v. John, 849 F.3d 912, 917 (10th Cir. 2017). See also United States v. Holloway, 826 F.3d 1237, 1249 (10th Cir. 2016).

"[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Here, petitioner was not denied his right to cross-examine witnesses; his questioning was simply limited to relevant matters. Because the Confrontation Clause allows this reasonable limit, petitioner's confrontation claim is without merit. The OCCA was therefore not unreasonable in its determination that the trial court's ruling did not violate any of petitioner's federal constitutional rights. Davis, 268 P.3d at 128.

Finally, petitioner has not shown that his due process rights were violated by exclusion of the evidence. "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." Lisenba v. California, 314 U.S. 219, 236 (1941). For the reasons discussed herein, petitioner was not denied a fundamentally fair trial by the trial court's exclusion of irrelevant evidence.

In conclusion, petitioner has failed to show that the OCCA was unreasonable in its denial of his Ground Three. Ground Three is therefore denied.

## C.    Ground Four:    Admission of the 911 Calls.

In Ground Four, petitioner asserts that State's Exhibit 190, the audiotape recording of the 911 calls, should not have been admitted because it was minimally relevant, highly emotional, and unduly prejudicial to both stages of trial. For the following reasons, petitioner's Ground Four does not warrant relief.

State's Exhibit 190 contains two 911 calls, one from Chinetta Hooks and a second one from her mother. Mrs. Hooks' call is about six minutes in length, although there is a great deal of silence at different points due to Mrs. Hooks' unconsciousness.[19] On the call, Mrs. Hooks reports that she, her sister, and her brother-in-law have been shot. She gives the 911 operator her address and asks for an ambulance. Screaming and crying can be heard in the background. At one point, Mrs. Hooks' hysterical ten-year-old daughter talks to the operator (Id. at 235-36). She tells the operator that there is blood on her mother and all over the kitchen floor. She says her mother is dying and she asks for help. At the end of the call, the police can be heard trying to get Mrs. Hooks' children out of the apartment. The second call is from Mrs. Hooks' mother. The record reflects that when Tia Green could not reach 911, she called both her mother and another sister. Although she was not able to reach her mother, she told her sister what happened and asked her to call the police (Tr. 4/30/07, 102-03). On the second call, Mrs. Hooks and Ms. Green's frantic

---

[19] *Mrs. Hooks testified that after being shot, she was in and out of consciousness (Tr. 4/30/07, 230, 235).*

mother tells the 911 operator that her daughter has been shot but she does not know where she is.

State's Exhibit 190 was admitted through the testimony of Mrs. Hooks. Petitioner objected to its admission arguing that it was only "minimally relevant" and "much more prejudicial than probative." The objection was overruled and the tape was played for the jury (Tr. 4/30/07, 230-31, 235). On direct appeal, petitioner challenged only the admission of Mrs. Hooks' 911 call, Brief of Appellant, Case No. D-2007-891, at 63-65, and therefore petitioner's challenge here to the mother's call is both unexhausted and procedurally barred. See Grounds One and Two, supra (discussing the application of an anticipatory bar to petitioner's unexhausted claims).[20]

Petitioner asserts that the admission of Mrs. Hooks' 911 call violated his rights to due process and a fair sentencing proceeding.[21] In rejecting petitioner's claim on direct appeal, the OCCA found that the trial court did not abuse its discretion in admitting the evidence in the first stage and that admission of the evidence did not undermine the

---

[20] *The claim also lacks merit. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Even if the mother's call should not have been admitted, its admission did not deny petitioner a fundamentally fair trial.*

[21] *Petitioner asserts violations of the Sixth, Eighth, and Fourteenth Amendments. However, as respondent asserts (and petitioner fails to dispute), petitioner did not claim a Sixth Amendment violation when he challenged Mrs. Hooks' 911 call on direct appeal. See Brief of Appellant, Case No. D-2007-891, at 63-65. Accordingly, a Sixth Amendment claim is unexhausted and procedurally barred. It is also without merit because petitioner has failed to adequately plead this claim. Petitioner's only reference to a Sixth Amendment violation is contained in the proposition heading, and this is clearly insufficient. Pet. at 42.*

reliability of the second stage.  Davis, 268 P.3d at 124-25.  Because the OCCA addressed the claim on the merits, AEDPA deference applies.

When a petitioner challenges the admission of evidence, "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" where the admitted evidence "is so unduly prejudicial that it renders the trial fundamentally unfair." Payne v. Tennessee, 501 U.S. 808, 825 (1991). See also Kansas v. Carr, 577 U.S. ___, 136 S. Ct. 633, 644-45 (2016) (acknowledging that the due process fundamental fairness test applies to capital sentencing proceedings as well). Undefined by specific legal elements, this standard obliges the court to "tread gingerly" and "exercise considerable self-restraint." Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks and citation omitted) (quoting United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir. 1990)). Relief is warranted in only "the most serious cases, which truly shock the conscience as well as the mind." Rivera, 900 F.2d at 1477 (internal quotation marks and citation omitted).

An alleged evidentiary error is not viewed in isolation, but is considered in light of the entire proceeding.  As acknowledged in Rivera, "a fundamental-fairness analysis is heavily dependent upon the peculiar facts of an individual trial." Id.  Thus, "inquiry into the fundamental fairness of the trial requires an examination of the entire proceedings, including the strength of the evidence against the defendant." Hanson v. Sherrod, 797 F.3d 810, 843 (10th Cir. 2015).

In finding that the trial court did not abuse its discretion in admitting Mrs. Hooks' 911 call in the first stage, the OCCA held as follows:

We have previously upheld the admission of 911 tapes in cases where the party on the tape testifies at trial. See Williams, 2008 OK CR 19, ¶ 71, 188 P.3d at 223; Stouffer, 2006 OK CR 46, ¶¶ 114-17, 147 P.3d at 269. The recording in this case was relevant as it corroborated both Hooks' and Green's versions of what happened in the apartment immediately after the shootings. This was particularly important in light of defense counsel's thorough cross-examination of the women and attempts to impeach their descriptions of the crime and surrounding circumstances. The recording showed Hooks' demeanor after being shot and explained how she might have trouble remembering details from the night of the shooting, and it tended to rebut [petitioner's] claim that Hooks walked to the bathroom after being shot in order to dispose of some marijuana. The recording in this case did not constitute testimonial evidence and is just the type of 911 call evidence the United States Supreme Court approved in Davis v. Washington, 547 U.S. 813, 827-828, 126 S.Ct. 2266, 2277, 165 L.Ed.2d 224 (2006).

While the emotional impact of the recording is undeniable, it is not so prejudicial as to have "swept all before it" as [petitioner] claims. In light of the other evidence presented by the State, the recording did not confuse the issues, mislead the jury, result in a needless presentation of cumulative evidence, cause unfair and harmful surprise to the defense or in any other way unfairly prejudice the defense. See 12 O.S.2001, § 2402.

Davis, 268 P.3d at 124-25. This determination is not unreasonable.

The OCCA's conclusion that the call was relevant for purposes of corroboration and to rebut an assertion made by the defense about Mrs. Hooks' capabilities after being shot are supported by the record (Tr. 4/30/07, 180-81, 257-58; Tr. 5/4/07, 848, 872-73). It was also not unreasonable for the OCCA to conclude that the emotional impact of the tape did not preclude its omission. Although petitioner asserts that the State introduced the tape because it "was seduced by its prejudicial power," Reply at 13, the tape was introduced and played for the jury during Mrs. Hooks' testimony, but thereafter not referred to by the State except as was relevant in closing argument to rebut the defense's claim about what Mrs. Hooks did after being shot (Tr. 5/4/07, 872-73). Under these circumstances, and

considering the evidence of petitioner's guilt which included his confession to law enforcement, it is clear that admission of the evidence did not deny petitioner a fundamentally fair first stage.

In denying petitioner second stage relief, the OCCA found no reversible error after considering the presented evidence. <u>Davis</u>, 268 P.3d at 125. This is also not unreasonable. At the start of the second stage, the State moved to incorporate the first stage evidence into the second stage (Tr. 5/14/07, 962-63). Beyond this general reference to the first stage evidence, no reference to the 911 call was made in the second stage.[22] In addition, the State's evidence of the aggravating circumstances was strong. <u>See</u> <u>Davis</u>, 268 P.3d at 121-23, 138-39. Petitioner was therefore not denied a fair and reliable sentencing proceeding due to the admission of Mrs. Hooks' 911 call in the first stage.

For the foregoing reasons, Ground Four is denied.

### D.      Ground Five:           Victim's Week Ribbons.

In Ground Five, petitioner asserts that he was denied a fair trial because Mr. Smith's mother and a district attorney employee briefly appeared in the courtroom during a break in voir dire proceedings wearing orange ribbons with gold lettering which read, "One Victim, One Crime, One Week." The OCCA addressed the merits of this claim on direct appeal. <u>Davis</u>, 268 P.3d at 99-101. Petitioner contends that the OCCA's decision denying

---

[22] *It bears noting that the 911 call was played for the jury on April 30th and the first stage concluded on May 4th. However, the second stage did not start until May 14th and the jury deliberated and returned a death sentence on May 16th. With this two-week gap between the playing of the tape and sentence consideration, it is likely that any emotional impact of the tape had faded.*

him relief is both legally and factually unreasonable, that the ribbons were inherently prejudicial as defined by <u>Estelle v. Williams</u>, 425 U.S. 501 (1976), and <u>Holbrook v. Flynn</u>, 475 U.S. 560 (1986), and that he is therefore entitled to a new trial.

On the second day of voir dire, defense counsel alerted the trial court that people in the courthouse had been seen wearing ribbons in support of victims' crime week. The ribbons read, "One Victim, One Crime, One Week." Defense counsel told the trial court that the ribbons came from the victim witness center (Tr. 4/24/07, 393-94). She was concerned that the prospective jurors may have seen the ribbons and been prejudiced, and she asked the court to question the prospective jurors about the matter (<u>id.</u> at 394). In describing the ribbons, the prosecutor stated that they were short and that the writing on them was small (<u>id.</u> at 395). Defense counsel added that the ribbons were "not as small as you might think." She described the ribbons as "orange, may be an inch and a half wide, maybe 4 inches long with gold lettering in bold . . . ." (<u>id.</u> at 396). The parties disputed how close you would have to be to the ribbon in order to read it (<u>id.</u> at 395, 396). The trial court agreed to question the prospective jurors about it (<u>id.</u> at 397).

Before the trial court had a chance to question the jurors, and while the trial court and attorneys were in chambers questioning a prospective juror about another matter, Mr. Smith's mother and a district attorney employee came into the courtroom. Both were wearing one of the ribbons. In front of the prospective jurors, the employee identified Mr. Smith's mother as she spoke with the bailiff near front row of the gallery. The employee left a note for one of the prosecutors with the bailiff and then both she and Mr. Smith's mother exited the courtroom (<u>id.</u> at 404-08).

Defense counsel expressed concern because "the ribbon has, you know, made it into the courtroom" and because Mr. Smith's mother had been identified in front of the jurors (id. at 408). While the prosecutor asserted that there was nothing inappropriate about Mrs. Smith's mother being in the courtroom, she "didn't think [the employee] should have come in with the ribbon on" (id. at 409). Although "satisfied that there was no impropriety," the trial court nevertheless decided to admonish the prospective jurors about the ribbon (id. at 409). Defense counsel's motion for a mistrial was overruled (id. at 409-10).

The matter was then discussed with the jurors as follows:

> THE COURT: Let the record reflect that all the parties are back in court and [petitioner] is present and all the jurors are present. Ladies and gentlemen, it's been brought to my attention and the lawyers' attention that there are individuals walking around with ribbons on that have some distinct writing on them. Have any of you seen them and had an opportunity to read them?

> UNIDENTIFIED FEMALE: (Raised hand.)

> THE COURT: We're really talking to people in the gallery right now. We'll come back.

> PROSPECTIVE JUROR DEASON: I've seen the ribbon.

> THE COURT: Excuse me one second. Let me go to my chart. I left my chart back in the back. Remain seated. Thank you.

> Okay. Ms. Deason, yes.

> PROSPECTIVE JUROR DEASON: Basically, I saw several people with them on but I didn't read them because I didn't have my glasses on at the time. Okay?

> THE COURT: Anyone else?

**PROSPECTIVE JUROR LANGO:**     (Raised hand.)

**PROSPECTIVE JUROR WOOD:**     I've seen the ribbon but I did not read it.

**PROSPECTIVE JUROR LINDENAU:**     There was a lady just a few minutes ago - -

**THE COURT:**     And that was our concern.  We have some indication about the writing on the ribbons.  I guess you should know this is the victim's right week and that's why the ribbons are being worn.

I guess what I'm saying to you is nobody needs to be influenced by that or any other - - because we're trying to preserve the integrity of this trial, we're trying as everyone will tell you is that everybody is entitled to a fair trial and any kind of outside influences that tend to influence your opinion before you have head any evidence just disrupts the integrity, it just causes us to wonder whether or not we need to quash the whole panel and start all over again, and that's what we're trying not to do.

And we have to depend on you, that you will not lose your focus and the focus of what we're asking you to do as jurors, and that's to be unbiased about these proceedings and not form an opinion or share with someone else an opinion that you have until the testimony is complete and you have gotten the rules of law by me and you've gone and you retire to deliberate.  Then it's free game.  You can discuss it, you can bring it in - - but all within the boundaries of the law and that's all we're asking.  Will you do that please?

**PROSPECTIVE JURORS:**     (Nod heads.)

**THE COURT:**     I'm sure a lot of things go on at the courthouse that sometimes question or bring into question the integrity of this process and those are influences we don't need, because like you say, we want you to think that if you were seated over where [petitioner] or where the State is that you would be, it would be a juror that holds the same ideas that you have as to unbiasness and what's right and equal treatment for everybody, both the State of Oklahoma and for [petitioner].  Can I be assured of that?

**PROSPECTIVE JUROR LEONARD:** Yes.

**PROSPECTIVE JUROR MEASE:**     Yes.

**PROSPECTIVE JURORS:**     (Nod heads.)

**THE COURT:** Mrs. Elliott [the prosecutor], do you have anything to comment as far as that is concerned?

**MRS. ELLIOTT:** I do. I was just going to address that briefly whenever I started.

**THE COURT:** Then Ms. Hammersten [defense counsel] will have an opportunity to further visit that issue when her opportunity comes to get up and visit with you, so with that I will recognize Mrs. Elliott.

**MRS. ELLIOTT:** Thank you. I think the point the Judge is trying to make is would you all agree none of us should be influenced whatsoever in the least, if you saw the ribbon, we should not be influenced by that at all, can you all agree to that?

**PROSPECTIVE JURORS:** (Nod heads.)

**MRS. ELLIOTT:** Anybody think they might be influenced by the fact that you saw an orange ribbon?

**PROSPECTIVE JUROR MEASE:** (Shakes head.)

**MRS. ELLIOTT:** And that's the way it should be.

(Tr. 4/24/07, 410-13).

In denying petitioner relief, the OCCA acknowledged the three relevant Supreme Courts cases, Williams, Flynn, and Carey v. Musladin, 549 U.S. 70 (2006). Although it found that the circumstances in petitioner's case fell between Williams/Flynn and Musladin, it ultimately concluded that the wearing of the ribbons amounted to spectator conduct and therefore under state law, petitioner had to show actual prejudice to obtain relief. Davis, 268 P.3d at 100 (citing Mitchell v. State, 884 P.2d 1186, 1196 (Okla. Crim. App. 1994)). The OCCA denied relief because petitioner had "failed to show he suffered any prejudice due to the display of the . . . ribbons." Davis, 268 P.3d at 100-01.

In <u>Williams</u>, 425 U.S. at 502, the Supreme Court addressed the issue of whether a defendant is denied a fair trial when he "is compelled to wear identifiable prison clothing" before the jury. The Court acknowledged that "a basic component of a fair trial" is "[t]he presumption of innocence" and that "[t]o implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process." <u>Id.</u> at 503.

> In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt. The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.

<u>Id.</u> at 503-04 (citations omitted). In condemning the practice, the Court found that "[t]he defendant's clothing is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play. <u>Id.</u> at 505. Ultimately, however, the Supreme Court denied relief due to the defendant's failure to object. <u>Id.</u> at 512-13.

In <u>Flynn</u>, 475 U.S. at 562, the Supreme Court addressed the issue of whether a defendant was denied a fair trial when, for security purposes, four uniformed state troopers sat in the first row of the gallery. The Court noted that the first issue to be addressed was whether the presence of this security force "is the sort of inherently prejudicial practice that . . . should be permitted only where justified by an essential state interest specific to each trial." <u>Flynn</u>, 475 U.S. at 568-59. The Court found it was not. <u>Id.</u> at 569. The Court

discussed "the wide[] range of inferences that a juror might reasonably draw from the officers' presence," including the very possibility that a juror would infer nothing at all.

> To be sure, it is possible that the sight of a security force within the courtroom might under certain conditions "create the impression in the minds of the jury that the defendant is dangerous or untrustworthy." Kennedy v. Cardwell, 487 F.2d 101, 108 (CA6 1973), cert. denied, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). However, "reason, principle, and common human experience," Williams, supra, 425 U.S., at 504, 96 S.Ct., at 1693, counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate.

Flynn, 475 U.S. at 569. With reference to Williams, 425 U.S. at 505, the Court therefore held that "[w]henever a courtroom arrangement is challenged as inherently prejudicial, . . . the question must be . . . whether 'an unacceptable risk is presented of impermissible factors coming into play.'" Flynn, 475 U.S. at 570. "[I]f the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." Id. at 572.

In Musladin, the Supreme Court reviewed the issue of family members wearing buttons with the victim's picture on them. The question before the Court was whether the state court's determination that this practice did not deny the defendant a fair trial was contrary to or an unreasonable application of Supreme Court law. The Court held that it was not. Musladin, 549 U.S. at 72. In so holding, the Court acknowledged that both Williams and Flynn dealt with government-sponsored practices, whereas the circumstances in Musladin were spectator conduct. Musladin, 549 U.S. at 75-76. Because it had never applied the inherent prejudice test from Williams and Flynn to spectator conduct, the Court

held that the state court's determination that the defendant was not denied a fair trial by wearing victim buttons was not an unreasonable application of Supreme Court law. Musladin, 549 U.S. at 76, 77.

Petitioner's primary complaint to the OCCA's decision is its determination that the challenged practice in his case was spectator conduct. However, this is not unreasonable. At most, the record shows that the ribbons were available in the district attorney's witness center. As the OCCA found, "[t]here is nothing in the record pertaining as to how they were handed out or displayed in the courthouse." Davis, 268 P.3d at 100. Having the ribbons available, where anyone can pick one up and make the choice to wear it, does not equate to a state-sponsored practice. There is no indication that anyone was forced to wear a ribbon, and but for the brief appearance of Mr. Smith's mother and the district attorney employee, the ribbons were not worn by anyone else in the courtroom and certainly not by anyone during the trial itself. Because the practice here did not concern a state-sponsored practice, Williams and Flynn do not apply and it is therefore unnecessary to determine whether the practice was inherently prejudicial.[23] It is also unnecessary for this court to

_____

[23] *Even if the State's actions were construed as a state-sponsored practice, it is clearly not inherently prejudicial. Using "reason, principle, and common human experience," the circumstances in this case did not present "an unacceptable risk . . . of impermissible factors coming into play."* Williams, *425 U.S. at 504, 505. First of all, the wording on the ribbons was generic, not case specific, and even then, it is difficult to see how the ribbon's message would have influenced the jury's deliberation process. Petitioner's contention that it "branded [him] with an unmistakable brand of guilt" is an unconvincing stretch of implication from "One Victim, One Crime, One Week." Pet. at 53. In addition, unlike the situation in* Williams *where a defendant was before the jury in prison clothes for the entire trial, the ribbons were only in the courtroom briefly during a break in voir dire proceedings with only a handful of prospective jurors (and only one actual juror) even seeing the ribbons inside or outside the courtroom.*

address prejudice at all.[24]   Since there is no Supreme Court authority on the potentially prejudicial effect of spectator conduct, the OCCA's decision cannot be found unreasonable on this basis.  <u>Musladin</u>, 549 U.S. at 77.  Ground Five is denied.

**E.      Grounds Six and Seven:   Jury Instructions.**

In Grounds Six and Seven, petitioner asserts that the trial court erred in failing to instruct the jury on self-defense and heat of passion manslaughter.  Petitioner raised these claims on direct appeal.  Concluding that petitioner was the aggressor and that he was not adequately provoked, the OCCA denied relief.  <u>Davis</u>, 269 P.3d at 114-15, 117-20.

"A habeas petitioner who seeks to overturn his conviction based on a claim of error in the jury instructions faces a significant burden."  <u>Ellis v. Hargett</u>, 302 F.3d 1182, 1186 (10th Cir. 2002).   "Unless the constitution mandates a jury instruction be given, a habeas petitioner must show that, in the context of the entire trial, the error in the instruction was so fundamentally unfair as to deny the petitioner due process."  <u>Tiger v. Workman</u>, 445 F.3d 1265, 1267 (10th Cir. 2006).   <u>See</u> <u>also</u> <u>Cummings v. Sirmons</u>, 506 F.3d 1211, 1240 (10th Cir. 2007) (citing Supreme Court authority for the proposition "that an instructional error can, under certain circumstances, result in a violation of a defendant's right to a fair trial").  <u>See</u> Article III.C., <u>supra</u> (discussing fundamental fairness analysis).

Petitioner asserts that the jury should have been instructed on self-defense in large part because based on his past experiences with Ms. Green which caused him to mistrust

---

[24] *The OCCA addressed prejudice as a matter of state law.  <u>Davis</u>, 268 P.3d at 100 (citing <u>Mitchell</u>, 884 P.2d at 1196).*

her and "fear that she would set him up." According to petitioner, Ms. Green invited him over that night and he was led to believe that no men would be present. Consequently, when Mr. Smith answered the door, petitioner was "put on edge." Pet. at 60-61. Petitioner claims that he shot Mr. Smith three times when Mr. Smith failed to back up and then "either jumped or moved in quickly toward [him]." Petitioner asserts that he pulled the trigger because he was scared. Id. at 61-62. Labeling the OCCA's view of the evidence as "constrained, inaccurate, and one-sided" and its conclusion that he was the aggressor as "untenable," petitioner asserts that he is entitled to relief because he has been denied the right to present a defense and a fundamentally fair trial.[25] Id. at 65, 66, 68-69.

"Although the right to present a defense is a fundamental element of due process of law, Oklahoma courts may define the scope of the defense to an Oklahoma crime." Patton v. Mullin, 425 F.3d 788, 808 (10th Cir. 2005) (internal quotations marks and citation omitted). "In Oklahoma, self-defense is not available to an aggressor." Le v. Mullin, 311 F.3d 1002, 1027 (10th Cir. 2002) (citing Ruth v. State, 581 P.2d 919, 922 (Okla.Crim.App.1978)).

In denying petitioner relief, the OCCA held as follows:

> Self-defense is an affirmative defense which admits the elements of the charge, but offers a legal justification for conduct which would otherwise be criminal. 21 O.S.2001, § 733(2). See also McHam v. State, 2005 OK CR 28, ¶ 10, 126 P.3d 662, 667; Camron v. State, 1992 OK CR 17, ¶ 13, 829 P.2d 47, 56; West v. State, 1990 OK CR 61, ¶ 6, 798 P.2d 1083, 1085.

---

[25] Because Petitioner's right to due process includes his right to present a defense, it is unnecessary to address these challenges separately. See Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.").

"Under Oklahoma law, '[s]elf-defense is a defense although the danger to life or personal security may not have been real, if a reasonable person, in the circumstances and from the viewpoint of the defendant, would reasonably have believed that he/she was in imminent danger of death or great bodily harm.' " Perryman v. State, 1999 OK CR 39, ¶ 9, 990 P.2d 900, 903 (quoting OUJI–CR (2d) 8-46). "The bare belief that one is about to suffer death or great personal injury will not, in itself, justify taking the life of [one's] adversary. There must exist *reasonable* grounds for such belief at the time of the killing." Id., 1999 OK CR 39, ¶ 9, 990 P.2d at 904 (emphasis in original). The right of self-defense cannot be invoked by an aggressor or by one who voluntarily enters into a situation armed with a deadly weapon. Orr v. State, 1988 OK CR 265, ¶ 7, 764 P.2d 1362, 1364. See also Le v. State, 1997 OK CR 55, ¶ 23, 947 P.2d 535, 547; Stiles v. State, 1992 OK CR 23, ¶ 26, 829 P.2d 984, 991; Ruth v. State, 1978 OK CR 79, ¶ 8, 581 P.2d 919, 922.

Arguably, the only evidence which could support [petitioner's] claim of self-defense was his statement that [Mr. Smith] lunged at him and he thought [Mr. Smith] might be trying to grab the gun. However, by [petitioner's] own statement, he was the aggressor in the situation, arriving at the apartment visibly armed. Taking [petitioner's] statement in the best light possible, he shot the unarmed [Mr. Smith] merely because he moved toward him and refused to back away. Based upon [petitioner's] statement, no rational jury would find [petitioner] had a reasonable belief he was in imminent danger of great bodily harm.

Further, when compared with the rest of the evidence, [petitioner's] statement does not support his claimed self-defense. Eizember v. State, 2007 OK CR 29, ¶ 111, 164 P.3d 208, 236 (a defendant's statements concerning the homicide are sufficient to warrant a jury instruction only if those statements are supported by other evidence presented at trial). It was obvious to all in the apartment, that [petitioner] was the only one armed. Ms. Green and Ms. Hooks testified that [petitioner] pointed the gun at all three of them when he first entered the apartment, then pointed it directly at [Mr. Smith] and proceeded to lower and raise it three times before shooting [him].

Further, this was not the first time [petitioner] had been the aggressor in situations involving Green. While the evidence showed Green had attacked [petitioner] on previous occasions, the evidence also showed that Green had filed for a temporary Victim Protection Order alleging [petitioner] repeatedly threatened and stalked her and that he had choked her and pulled a knife on her. [Petitioner's] own statements showed he was obsessed with

making amends for perceived wrongs committed by Green against him. This evidence, combined with [petitioner] arriving at the apartment heavily armed, shows he was prepared for a violent confrontation.

When the record reveals no evidence of self-defense, the trial court is not bound to instruct on that defense. Smallwood v. State, 1995 OK CR 60, ¶ 46, 907 P.2d 217, 230. As the evidence in this case did not support [petitioner's] statements concerning his claim of self-defense or otherwise support a claim of self-defense, the trial court did not abuse its discretion in refusing to give the requested jury instruction.

Davis, 268 P.3d at 114-15.

The OCCA's determination that petitioner was the aggressor, and was therefore not entitled to a self-defense instruction, is reasonable. See Frost, 749 F.3d at 1225; Stouffer, 738 F.3d at 1221. Regardless of his history with Ms. Green, petitioner came to the apartment looking for trouble. He was armed with a loaded semi-automatic weapon and he had a fully loaded clip in his pocket. He "was dressed in all black, including a black hoodie pulled over his head." After knocking on the apartment door, he covered the peephole to prevent being seen, and when he entered the apartment, the gun was in his hand. He shut and locked the door behind him. By all accounts, petitioner was the only one in the apartment with a weapon. Davis, 268 P.3d at 98, 112. And even if petitioner did not start shooting until Mr. Smith failed to heed his warnings to back up and then jumped or lunged toward him, id. at 98, 112, 116, Oklahoma law does not permit "one who voluntarily enters into a situation armed with a deadly weapon" to claim self-defense. Id. at 115. For these reasons, the absence of a self-defense instruction did not deny petitioner a fundamentally fair trial.

In addition to a self-defense instruction, petitioner also requested an instruction on the lesser-included offense of heat of passion manslaughter, but the OCCA concluded that petitioner was not entitled to this instruction either. The OCCA reasoned as follows:

"A homicide may be reduced from murder to manslaughter where the killing was done because the slayer believed that he was in great danger, even if he was not warranted in such belief or where the slayer although acting in self-defense was not himself free from blame." McHam, 2005 OK CR 28, ¶ 14, 126 P.3d at 668, *quoting* Wood v. State, 1971 OK CR 232, ¶ 9, 486 P.2d 750, 752. See also Le, 1997 OK CR 55, ¶ 21, 947 P.2d at 546-547. Depending on the evidence, a jury might conclude that the defendant's self-defense claim is "imperfect," and while not sufficient to negate culpability, at least sufficient to mitigate it. In such situations, instructions on heat-of-passion manslaughter may be warranted. Id.

To warrant an instruction on first degree heat of passion manslaughter, there must be evidence that the defendant killed the deceased with adequate provocation, in a heat of passion, without the design to effect death. 21 O.S.2001, § 711(2). See also Eizember, 2007 OK CR 29, ¶ 112, 164 P.3d at 236. The "passion" necessary to support a manslaughter instruction must be so great as to "render the mind incapable of forming a design to effect death. . . ." Eizember, 2007 OK CR 29, ¶ 112, 164 P.3d at 236. The elements of heat of passion are 1) adequate provocation; 2) a passion or emotion such as fear, terror, anger, rage or resentment; 3) homicide occurred while the passion still existed and before a reasonable opportunity for the passion to cool; and 4) a causal connection between the provocation, passion and homicide. Id. The question is whether, in addition to evidence of intent, there was evidence that [petitioner] killed [Mr. Smith] with adequate provocation, in a heat of passion, without the design to effect death. Id. Adequate provocation is measured by an objective test of reasonableness. Bland, 2000 OK CR 11, ¶ 36, 4 P.3d at 715.

[Petitioner] refers us to cases finding that heat of passion can result from fear and anger which precludes rational reasonable thought. However, in each case the victim either attacked the defendant without provocation or attacked the defendant with a dangerous weapon.[FN7] These cases do not suggest this instruction is appropriate absent evidence of adequate provocation.

FN7.  Hogan v. Gibson, 197 F.3d 1297, 1309 (10th Cir.1999) (victim attacked defendant with a knife); Hayes v. State, 1981 OK CR 96, ¶ 2,

633 P.2d 751, 752 (victim attacked defendant with knife); Farmer v. State, 1977 OK CR 215, ¶ 22, 565 P.2d 1068, 1070 (victim shot first); Williams v. State, 1973 OK CR 354, ¶ 8, 513 P.2d 335, 336-8 (victim attacked defendant with scissors and threatened to cut his heart out); Wood v. State, 1971 OK CR 232, ¶¶ 2-4, 486 P.2d 750, 751-752, (victim and defendant involved in a "street brawl").

In his statement to police, [petitioner] said he was mad at Green when he went to her apartment. He repeatedly said he took the gun to the apartment because he did not trust Green based upon her previous conduct toward him. He said he didn't know if she was "setting [him] up" or "playing games" or really wanted to work things out. [Petitioner] said he did not expect a man to be at the apartment. Only once in his forty-nine page statement to police did he say he was scared. [Petitioner] explained that he did not know what [Mr. Smith] was doing, whether he was trying to grab for the gun, or "he was really trying to hurt me, or was he just trying to stop me from doing something. I don't know. . . . But in the moment of that time, I got scared."

The unarmed [Mr. Smith's] movement toward the armed [petitioner] was not sufficient provocation to support heat of passion manslaughter. See Washington v. State, 1999 OK CR 22, ¶ 13, 989 P.2d 960, 968, n. 4 (adequate provocation requires personal violence by the deceased likely to cause pain, bloodshed or bodily harm).[FN8] Even by [petitioner's] own statement, [Mr. Smith] had not verbally threatened him. At most, the men were arguing about what was going on, and not engaged in a physical altercation. Any movement by [Mr. Smith] towards [petitioner] could reasonably be seen as an attempt to defend and protect himself, Green, and Hooks. [Petitioner] is not entitled to a heat of passion manslaughter instruction because [Mr. Smith] attempted to defend himself and protect others. Id. See also Young, 2000 OK CR 17, ¶ 60, 12 P.3d at 39.

> FN8.   Under OUJI–CR (2d) 4-98, adequate provocation is defined in part as "any **improper conduct** of the deceased toward the defendant(s) which naturally or reasonably would have the effect of arousing a sudden heat of passion within a reasonable person in the position of the defendant(s)". . . . Personal violence or aggression by the deceased of a nature sufficiently violent to cause or threaten to cause pain, bloodshed, or bodily harm to the defendant may be adequate provocation. See OUJI–CR (2d) 4-98. (emphasis added).

Further, [petitioner's] single, general statement that he was scared during the commission of the offense is not enough to establish the requisite fear or terror necessary to support heat of passion manslaughter. See Jones v.

<u>State</u>, 2006 OK CR 17, ¶ 7, 134 P.3d 150, 154 (defendant's claim of "[b]eing 'scared' after being grabbed while committing First Degree Murder does not" warrant instruction on First Degree Manslaughter).

> After reviewing [petitioner's] statement to the police, by itself, and in context of the other evidence presented at trial, a *prima facie* case of manslaughter was not established as no reasonable juror could find that [petitioner] acted in a heat of passion on adequate provocation that rendered him incapable of forming a design to effect death. The evidence in this case would not permit a jury rationally to find [petitioner] guilty of the lesser offense of heat of passion manslaughter and acquit him of first degree murder. Therefore, the trial court did not abuse its discretion in refusing the requested instruction[].

<u>Davis</u>, 268 P.3d at 117-19.

Here, again, the OCCA's decision is reasonable. As set forth in the OCCA's opinion, a manslaughter instruction is not warranted in the absence of adequate provocation and adequate provocation requires improper conduct on behalf of the victim. <u>Id.</u> at 118 & n.8. There was no evidence that Mr. Smith engaged in any improper conduct. Mr. Smith was not armed, and although Mr. Smith questioned petitioner's actions, he did not verbally threaten petitioner. At most, Mr. Smith may have moved toward petitioner, but this is not improper conduct. Even if Mr. Smith moved toward petitioner in an effort to grab the gun, he had a lawful right to respond to the threat petitioner was posing to him and the others in the apartment. Because the evidence did not support an instruction on heat of passion manslaughter, petitioner was not denied a fundamentally fair trial in its absence. For this same reason, the OCCA's decision is also not contrary to or an unreasonable application of <u>Beck v. Alabama</u>, 447 U.S. 625, 627 (1980), as it requires a jury instruction on a lesser-included non-capital offense only when it is supported by the evidence. <u>See Davis</u>, 268 P.3d at 119-20 (denying petitioner's <u>Beck</u> claim).

For the reasons set forth herein, petitioner is not entitled to relief on his Grounds Six and Seven.

## F.    Ground Eight:    Cumulative Error.

In Ground Eight, Petitioner argues that he is entitled to relief on the theory of cumulative error.[26]  "In some circumstances, trial errors might in isolation be insignificant, but collectively be serious enough to deprive the defendant of fundamental fairness. When that happens, the defendant may obtain relief on the basis of cumulative error."  Hancock v. Trammell, 798 F.3d 1002, 1025 (10th Cir. 2015).[27]  Such is not the case here, and therefore Ground Eight is denied.

## IV.  Motion for an Evidentiary Hearing.

Petitioner has filed a motion for an evidentiary hearing. Doc. 19. In the motion, petitioner requests a hearing on his Grounds One and Two and on "any other issues, substantive or procedural, which involve facts not apparent from the existing record or any issues that involve facts disputed by Respondent."  Doc. 19 at 2-3.  There is, however, no need for a hearing if petitioner's claims can be resolved on the existing record.  Anderson v. Att'y Gen. of Kan., 425 F.3d 853, 859 (10th Cir. 2005). Because most of petitioner's claims have been resolved in accordance with the AEDPA, a hearing on those claims is not only

_____

[26] On direct appeal and in post-conviction, Petitioner alleged that he was entitled to relief on a cumulative error theory.  The OCCA denied the claim on both occasions.  Davis, No. PCD-2007-1201, slip op. at 10; Davis, 268 P.3d at 138.

[27] The Tenth Circuit has acknowledged its "murky" position "on 'whether the need to conduct a cumulative-error analysis is clearly established federal law' for AEDPA purposes . . . ."  Eizember v. Trammell, 803 F.3d 1129, 1148 n.8 (10th Cir. 2015), cert. denied, 136 S. Ct. 2468 (2016) (quoting Hooks v. Workman, 689 F.3d 1148, 1194 n.24 (10th Cir. 2012)).

unnecessary but precluded by Pinholster, 563 U.S. at 181.  See Jones v. Warrior, 805 F.3d 1213, 1222 (10th Cir. 2015) (citing Pinholster and denying a request for an evidentiary hearing due to a petitioner's failure to satisfy Section 2254(d)), cert. denied, 137 S. Ct. 109 (2016).  Petitioner's remaining claims have been procedurally barred, and no additional evidence was required to make that determination. Therefore, the court concludes that a hearing is unnecessary and petitioner's motion is denied.

### V.  Conclusion.

Having concluded petitioner's arguments do not establish a right to relief, his petition for writ of habeas corpus is **DENIED**, as is his request for an evidentiary hearing.  Docs. 17 and 19.  Judgment will enter accordingly.

IT IS SO ORDERED this 20th day of September, 2017.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE